IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| KIM HAMMOND, et al )<br>)<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>IAN S. LEOPOLD, et al )<br>)<br>*Defendants.* )<br>_____) | Case No. 1:25-cv-00336-RDB |

### AFFIDAVIT OF IAN LEOPOLD

I, Ian Leopold declare as follows:

1. I am over the age of eighteen and competent to testify to the matters set forth herein.

2. I am a businessman and entrepreneur and a 1988 graduate of Northwestern's Kellogg School of Management.

3. I am the Managing Member of Pridewear, LLC ("Pridewear"), a position I have held since 2012 when the company was formed, and I have personal knowledge of the facts and agreements at issue in this case.

4. Pridewear is an apparel company marketed to university recreational sports and fitness departments, club and intramural sports teams and law enforcement agencies, fire departments. Pridewear was formed in Delaware on May 12, 2012, as American Collegiate Sports and Fitness, LLC, and subsequently changed its name to Pridewear, LLC in 2015.

5. Pridewear is a Delaware limited liability company with its principal place of business located at 575 Madison Avenue, New York, New York.

6. In 2019, Pridewear opened an office in San Diego, California to stay close to family when my brother-in-law passed away. Pridewear still maintains its principal office in New York.

7. Defendant American Collegiate Sports, LLC ("ACS") is a separate entity with no ownership in Pridewear.

8. I formed ACS on April 1, 2010; ACS is a Delaware limited liability company that provides sports, recreational, and fitness activities and offers sports sponsorship and marketing research services primarily to Fortune 500 companies. Pridewear and ACS are two separate and distinct entities with separate ownership groups.

9. Upon information and belief, Plaintiff Milnel Foundation Inc. ("MFI") is an entity controlled by co-Plaintiff Kim Hammond ("Mr. Hammond"), however MFI has no investments with Pridewear.

10. In 2020, Mr. Hammond approached me about a one-time transaction whereby Pridewear would sell him apparel that his family foundation, MFI would then donate to Scripps Hospital Emergency Rooms in San Diego, Ca at the height of Covid. The donation was covered by local TV News and newspaper. Mr. Hammond than approached me again to sell Milnel apparel that he would donate to JHPIEGO, a non-profit organization associated with Johns Hopkins, located in Baltimore, Maryland and Mr. Hammond stated he was on the JHPIEGO Advisory Board. Pridewear sold MFI the apparel for the donation to JHPIEGO, and has had no other transactions with MFI, JHPIEGO or Mr. Hammond. Mr. Hammond was very happy with the quality of the apparel purchased delivered to JHPIEGO as a Donation from MFI in his personal capacity, however, Mr. Hammond or MFI never paid Pridewear for the apparel donated to JHPIEGO.

11. I first met Mr. Hammond when I moved to Baltimore, Maryland in 1992 from Rochester, New York with my company, Campus Concepts, Inc., a company I founded while I was still in college. At the time Campus Concepts published The Unofficial Student Guide, which

at that time was the largest collegiate city shopping guide in the United States. I chose to set up Campus Concepts, Inc. in Maryland due to the lower cost of doing business compared to New York.

12. Mr. Hammond was my neighbor while I lived in Baltimore and through the years, we became close friends. We remained close friends even when I moved back to New York in 2004, after I closed Campus Concepts. Mr. Hammond and I kept in touch through the years, he used my NY apartment for free occasionally when I was out of town. In 2014 I helped Mr. Hammond sell his business, the Falls Road Animal Hospital as an unpaid advisor, given our close friendship.

13. Pridewear found its investors by compiling a list of experienced investors with net worths over $10 million, most with an MBA in finance, that were previously known by me or by the retired dean of Northwestern's Kellogg School of Management and chairman of Pridewear's advisory board, who helped me compile the list. Mr. Hammond was never included in any Pridewear's investor target list.

14. Pridewear contacted investors on that list through email and phone call to assess interest. Pridewear did not contact any investors or potential investors located in Maryland at any time.

15. In 2014, I helped Mr. Hammond sell his company, Falls Road Animal Hospital, and would let him use Pridewear's boardroom in New York during those negotiations. At Mr. Hammond's request, I met with the acquiring company's CEO in our NY office. We never charged Mr. Hammond any fees for uses of our office or my advisory services, given our close friendship.

16. In October of 2014, Mr. Hammond was in New York, and we had a social lunch. At that lunch, in response to Mr. Hammond's inquiry as to what I had been up to, I mentioned that

Pridewear had been reaching out to various investors. Unsolicited, Mr. Hammond asked to participate in the funding of Pridewear.

17. Pridewear did not at any time approach Mr. Hammond in Maryland or anywhere else for an investment. I never participated in any investment discussions with Mr. Hammond in Maryland, and Pridewear never marketed itself to anyone residing in Maryland. The only investors that were contacted were required to have been known to myself or to my former college professor and have assets over $10 million.

18. I was initially hesitant to take Mr. Hammond on as an investor due to his relative inexperience investing in start-up businesses, however due to our relationship and history I agreed to take him on as an investor, and on or about February 2, 2015, Mr. Hammond made his initial investment in Pridewear. On February 2, 2015, Pridewear issued Mr. Hammond a Convertible Promissory Note documenting the investment. A true and correct copy of the Convertible Note is attached hereto as **Exhibit 1.**

19. Mr. Hammond made numerous investments over the years, and he received a Convertible Promissory Note for each investment up until April 30, 2019, when he converted his investments to equity. Mr. Hammond's investments are as follows:

    a. February 2, 2015 - $100,000.00 (Convertible Debt)

    b. May 20, 2015 - $25,000.00 (Convertible Debt)

    c. August 25, 2017 - $48,953.00 (Convertible Debt)

    d. March 28, 2018 – $59, 474.00 (Convertible Debt)

    e. April 27, 2018 - $100,000.00 (Convertible Debt)

    f. April 30, 2019 - $100,000.00 (Equity)

    g. June 12, 2019 - $100,000.00 (Equity)

      h. June 18, 2019 - $150,000.00 (Equity)

      i. October 28. 2019 - $50,000.00 (Equity)

      j. December 6, 2019 - $86,648.00 (Equity)

      k. February 19, 2020 - $75,000.00 (Equity)

      l. March 26, 2020 - $50,000.00 (Equity)

20. Pridewear mailed all investor contracts and related materials to investors from Pridewear's office in New York City. Investors then executed the contracts at their respective locations and delivered the contracts back to Pridewear's office in New York City.

21. Pridewear received investments from Mr. Hammond via wire transfer to Pridewear's New York based bank, JPMorgan Chase.

22. Pridewear's investor meetings all took place over zoom, which were initiated at Pridewear's offices in New York or California.

23. Mr. Hammond is the only Pridewear investor who is located in Maryland. In total, Pridewear has 23 investors spread out among seventeen (17) cities in ten (10) different states: three Pridewear investors are in New York (two in New York City; one in Scarsdale); five more investors are in Illinois (three in Chicago, one in Evanston and one in Glencoe); three investors are located in Florida (in Jupiter, Juno Beach and Weston, respectively); three investors are from New Jersey (two in Westfield and one in Chatham); three more are located in Okatie, South Carolina; two investors are located in California (in La Jolla and Beverly Hills); and the remaining investors are from Newton, Massachusetts; Tulsa, Oklahoma and Westport, Connecticut.

24. The Convertible Note authorized Mr. Hammond's investment to be converted to membership interests in Pridewear, in which event Mr. Hammond would surrender the Note to

Pridewear at its principal office, and Pridewear would then issue documentation for Hammond's membership interest.

25. On or about April 29, 2019, Mr. Hammond converted his investment to equity by surrendering the Convertible Note to Pridewear and executing a Common Unit and Warrant Purchase Agreement, which documented his membership interest. A true and accurate copy of the Common Unit and Warrant Purchase Agreement is attached hereto and incorporated herein by refence as **Exhibit 2.**

26. The Common Unit and Warrant Purchase Agreement includes a forum selection clause with the following language:

> 6.12 Dispute Resolution. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of New York and to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) *agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of New York or the United States District Court for the Southern District of New York*, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, any such suit, action or proceeding, any claim that is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(emphasis added).

27. Pridewear included the forum selection clause in the Common Unit and Warrant Purchase Agreement as a practical measure because its investors were spread out across the country and the company is based in New York, and Pridewear's corporate counsel is located in New York.

28. The Common Unit and Warrant Purchase Agreement references Pridewear's Operating Agreement. Pridewear did not create a replacement Operating agreement and treats the

original American Collegiate Sports and Fitness, LLC Operating Agreement as Pridewear's Operating Agreement. A true and correct copy of Pridewear's Operating Agreement is attached hereto as **Exhibit 3.**

29. The Common Unit and Warrant Purchase Agreement also refers to Exhibit B, the form of Warrant, however the Exhibit B attached to the agreement was a blank page. A true and correct copy of the form of warrant in use at the time (and intended as Exhibit B to the Common Unit and Warrant Purchase Agreement) is attached hereto as **Exhibit 4.**

30. The exhibits attached hereto, comprised of copies of the Convertible Promissory Notes, Common Unit and Warrant Purchase Agreement, the January 28, 2015 Convertible Note Purchase Agreement, and Pridewear's Operating Agreement, are true and accurate copies of the original documents that were made and kept in the regular course of Pridewear's business; the documents were made at or near the time of the information recorded by someone with knowledge; it was the regular practice of Pridewear to record the information set forth in the attached documents; and the affiant is familiar with the records and the circumstances under which they were made.

31. All of Pridewear's records are located at its offices in New York or California and except for Mr. Hammond, all potential witnesses concerning Pridewear are located outside of Maryland.

      I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true to the best of my knowledge, information and belief.

Date:   June 16, 2025

                                                        Ian Leopold