<div style="text-align:right;border:1px solid black;padding:4px;display:inline-block;">**EXHIBIT 2**</div>

# PRIDEWEAR, LLC

## COMMON UNIT AND WARRANT PURCHASE AGREEMENT

THIS COMMON UNIT AND WARRANT PURCHASE AGREEMENT (this "**Agreement**"), is made as of April 29, 2019, by and among Pridewear, LLC, a Delaware limited liability company (the "**Company**"), and the investors listed on Exhibit A attached to this Agreement (each, a "**Purchaser**" and together the "**Purchasers**").

The parties hereby agree as follows:

## ARTICLE I.
## PURCHASE AND SALE OF COMMON UNITS AND WARRANTS

1.1 Sale and Issuance of Common Units and Warrants. Subject to the terms and conditions of this Agreement, each Purchaser agrees to purchase at the Closing and the Company agrees to sell and issue to each Purchaser at the Closing that number of Units (as defined below) set forth on Exhibit A, at a purchase price of $2.00 per Unit (the "**Per Unit Purchase Price**"). In further consideration for the purchase of the Units (other than Units obtained in exchange for the conversion and/or cancellation of Notes pursuant to Section 1.4 below), the Company shall issue to each Purchaser a warrant, in substantially the form attached hereto as Exhibit B (a "**Warrant**"), to purchase twenty-five percent (25%) of the Units purchased hereunder (the "**Warrant Units**"), at an exercise price of $3.00 per Unit. For the avoidance of doubt, no Purchaser shall be entitled to a Warrant as consideration for the conversion and/or exchange of a Note pursuant to Section 1.4 below.

1.2 Closing; Delivery.

(a) The initial purchase and sale of the Units and issuance of Warrants shall take place remotely via the exchange of documents and signatures, at such time and place as the Company and the Purchasers mutually agree upon, orally or in writing (which time and place are designated as the "**Initial Closing**"). In the event there is more than one closing, the term "**Closing**" shall apply to each such closing unless otherwise specified.

(b) At each Closing, the Company shall make available evidence of ownership of Units and Warrant being purchased by such Purchaser at such Closing against payment of the purchase price therefor by check payable to the Company, by wire transfer to a bank account designated by the Company, by cancellation or conversion of indebtedness of the Company to Purchaser, including interest, or by any combination of such methods.

1.3 Sale of Additional Units and Additional Warrants.

(a) After the Initial Closing, the Company may sell, on the same terms and conditions as those contained in this Agreement, up to 1,250,000 additional Units ("**Additional Units**"), at the Per Unit Purchase Price, along with warrants totaling twenty-five (25%) of the Units hereunder ("**Additional Warrants**"), to additional investors selected by the Company (the "**Additional Purchasers**"), provided that each Additional Purchaser shall become a party to the Transaction Agreements, by executing and delivering a counterpart signature page to each of the

Transaction Agreements. <u>Exhibit A</u> to this Agreement shall be updated to reflect the number of Additional Units and Additional Warrants purchased at each such Closing and the parties purchasing such Additional Units and Additional Warrants. Units of the Company issued to the Purchasers pursuant to this Agreement (including any Additional Units) shall be referred to in this Agreement as "**Units**". Warrants of the Company issued to the Purchasers pursuant to this Agreement (including any Additional Warrants) shall be referred to in this Agreement as "**Warrants**".

1.4 <u>Use of Proceeds</u>. The Company will use the proceeds from the sale of the Units for expenditures incurred in the ordinary course of operating the business, corporate expenses and working capital needs.

1.5 <u>Defined Terms Used in this Agreement</u>. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Operating Agreement.

(a) "**Act**" means the Delaware Limited Liability Company Act, as the same may be amended, modified, superseded and replaced from time to time.

(b) "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner or managing member or any venture capital fund now or hereafter existing that is controlled by, or is under common control with, one or more general partners or managing members of, or shares the same management company with, such Person.

(c) "**Code**" means the Internal Revenue Code of 1986, as amended.

(d) "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company.

(e) "**Person**" means any individual, general partnership, limited partnership, limited liability company, trust, estate, association, corporation or other legal or commercial entity and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person" where the context so permits.

(f) "**Securities**" means collectively the Units, Warrants and Warrant Units.

(g) "**Securities Act**" means the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder.

(h) "**Transaction Agreements**" means this Agreement, the Warrants and the Operating Agreement.

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company hereby represents and warrants to each Purchaser that, , the following representations are true and complete as of the date of the Initial Closing, except as otherwise indicated.

2.1 Organization, Good Standing, Company Power and Qualification. The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to carry on its business as presently conducted and as proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2 Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.

2.3 Authorization. All Company action required to be taken by the managers and members of the Company in order to authorize the Company to enter into the Transaction Agreements, and to issue the Units and Warrants at a Closing, has been taken or will be taken prior to such Closing. All action on the part of the managers and officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of a Closing, and the issuance and delivery of the Securities has been taken or will be taken prior to such Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Operating Agreement may be limited by applicable federal or state securities laws.

Valid Issuance of Securities.

(a) The Securities, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser. Assuming the accuracy of the representations of the Purchasers in Section 3 of this Agreement and subject to the filings described in Section 2.5 below, the Securities will be issued in compliance with all applicable federal and state securities laws.

2.4 Governmental Consents and Filings. Assuming the accuracy of the representations made by the Purchasers in Section 3 of this Agreement, no consent, approval, order or

authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner.

2.5 Compliance with Other Instruments. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any provision, instrument, judgment, order, writ, decree, contract or agreement or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.6 Capitalization of the Company. As of the Initial Closing, a total of 10,000,000 Units are issued and outstanding. As of the Initial Closing, the Company has issued convertible promissory notes with an aggregate outstanding principal amount of $3,476,219. Such notes will convert into Common Units once an aggregate of $1,000,000 in Units has been sold and issued pursuant to this agreement.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.

Each Purchaser hereby represents and warrants to the Company, severally and not jointly, that:

3.1 Authorization. The Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which the Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Operating Agreement may be limited by applicable federal or state securities laws.

3.2 Purchase Entirely for Own Account. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Securities to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the

Securities. The Purchaser has not been formed for the specific purpose of acquiring the Securities.

3.3 Disclosure of Information. The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Securities with the Company's management and has had an opportunity to review the Company's facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Purchasers to rely thereon.

3.4 Investment Experience. The Purchaser is an investor in securities of companies of similar size and scope and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.

3.5 Restricted Securities. The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.6 No Public Market. The Purchaser understands that no public market now exists for the Securities, and that the Company has made no assurances that a public market will ever exist for the Securities.

3.7 Legends. The Purchaser understands that the Securities and any securities issued in respect of or exchange for the Securities, may bear one or all of the following legends:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES OR SO-CALLED "BLUE SKY LAWS," AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE ASSIGNED EXCEPT (1) PURSUANT TO A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES WHICH IS EFFECTIVE UNDER THE ACT OR (2) UPON RECEIPT FROM COUNSEL

SATISFACTORY TO THE COMPANY OF AN OPINION, WHICH OPINION IS SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY, TO THE EFFECT THAT SUCH SECURITIES MAY BE OFFERED, SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE ASSIGNED (A) PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES AND SO-CALLED "BLUE SKY LAWS."

(a) Any legend set forth in, or required by, the other Transaction Agreements.

(b) Any legend required by the securities laws of any state to the extent such laws are applicable to the Securities represented by the certificate, instrument, or book entry so legended.

3.8 Accredited Investor. The Purchaser is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.9 Foreign Investors. If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Securities, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Securities. The Purchaser's subscription and payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

3.10 No General Solicitation. Neither the Purchaser, nor any of its officers, directors, managers, employees, agents, stockholders, members or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Securities.

3.11 Exculpation Among Purchasers. The Purchaser acknowledges that it is not relying upon any Person, other than the Company and its officers and managers, in making its investment or decision to invest in the Company The Purchaser agrees that neither any Purchaser nor the respective controlling Persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Securities.

3.12 Residence. If the Purchaser is an individual, then the Purchaser resides in the state or province identified in the address of the Purchaser set forth on Exhibit A; if the Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of the Purchaser in which its principal place of business is identified in the address or addresses of the Purchaser set forth on Exhibit A.

## ARTICLE IV.
## CONDITIONS TO THE PURCHASERS' OBLIGATIONS AT CLOSING.

The obligations of each Purchaser to purchase Units at the Initial Closing or any subsequent Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

4.1 Representations and Warranties. The representations and warranties of the Company contained in Section 2 shall be true and correct in all respects as of such Closing.

4.2 Performance. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

4.3 Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be obtained and effective as of such Closing.

4.4 Proceedings and Documents. All company and other proceedings in connection with the transactions contemplated at such Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to each Purchaser, and each Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

4.5 Warrant. The Company shall have executed and delivered a Warrant to each Purchaser entitled to a Warrant.

## ARTICLE V.
## CONDITIONS OF THE COMPANY'S OBLIGATIONS AT CLOSING.

The obligations of the Company to sell Units to the Purchasers at the Initial Closing or any subsequent Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

5.1 Representations and Warranties. The representations and warranties of each Purchaser contained in Section 3 shall be true and correct in all respects as of such Closing.

5.2 Performance. The Purchasers shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before such Closing.

5.3 Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be obtained and effective as of such Closing.

## ARTICLE VI.
## MISCELLANEOUS.

6.1 Survival of Warranties. Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchasers contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchasers or the Company.

6.2 Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.3 Governing Law. This Agreement shall be governed by and construed under the laws of the State of Delaware without regard to the conflict of law principles thereof.

6.4 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.5 Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.6 Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page or Exhibit A, or to such e-mail address or address as subsequently modified by written notice given in accordance with this Section 6.6. If notice is given to the Company, a copy (which shall not be deemed to constitute notice) shall also be sent to Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attention: Daniel A. Lang.

6.7 No Finder's Fees. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which such

Purchaser or any of its officers, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.8 Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of a majority of the then-outstanding Units purchased pursuant to this Agreement. Any amendment or waiver effected in accordance with this Section 6.8 shall be binding upon the Purchasers and each transferee of the Units, each future holder of all such securities, and the Company.

6.9 Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

6.10 Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

6.11 Entire Agreement. This Agreement (including the Exhibits hereto) and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

6.12 Dispute Resolution. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of New York and to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of New York or the United States District Court for the Southern District of New York, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

<u>Waiver of Jury Trial</u>: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Each party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the Southern District of New York or any court of the State of New York having subject matter jurisdiction.

*****

IN WITNESS WHEREOF, the parties have executed this Common Unit and Warrant Purchase Agreement as of the date first written above.

**COMPANY:**

**Pridewear, LLC**

By: _____
Name: Ian S. Leopold
Title: Managing Member

[Signature Page to Common Unit and Warrant Purchase Agreement]

IN WITNESS WHEREOF, the parties have executed this Common Unit and Warrant Purchase Agreement as of the date first written above.

**PURCHASER: If an INDIVIDUAL**

By: _____
(signature)

Name: Kim J. Hammond

Aggregate Investment: $100,000

Number of Units Purchased: 50,000

Number of Warrant Units: 12,500

[Signature Page to Common Unit and Warrant Purchase Agreement]

EXHIBIT A

SCHEDULE OF COMMON UNIT and WARRANT PURCHASE

| Name | Aggregate Purchase Price (Cash) | Units | Warrant Units |
|---|---|---|---|
| **Kim J. Hammond**<br>Address:<br><u>8407 Greenspring Ave Baltimore, MD 21208</u><br><br>Email Address:<br><u>hammonddvm@aol.com</u> | $100,000 | 50,000 | 12,500 |