**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Kim Hammond; and Milnel Foundation, Inc.<br><br>Plaintiffs,<br><br>vs.<br><br>Ian S. Leopold; and Pridewear, LLC<br><br>Defendants. | Case No: 1:25-cv-10002-RA<br><br>**AMENDED COMPLAINT** |

Plaintiffs Kim Hammond and Milnel Foundation, Inc., through undersigned counsel, bring claims against Defendants Ian S. Leopold and Pridewear, LLC. In support of those claims, Plaintiffs allege as follows:

### Introduction

1.    In early 2015, Kim Hammond started investing in his friend Ian Leopold's business, Pridewear, LLC ("Pridewear"). Mr. Hammond trusted Leopold because he believed—and reasonably relied upon—Leopold's repeated representations touting Pridewear's great prospects for success, including a "conservative" estimate of Pridewear surpassing $100 million in annual revenue and even a potential private equity buyout.

2.    Now, after investing over one million dollars of his own money and that of a charitable foundation he oversees, Mr. Hammond has received no repayment of principal, no interest, no distributions, and no valid documentation of any interest he may possess in Pridewear.

1

3.    Mr. Hammond was induced into and defrauded out of his investment, and also suffered the several other wrongs enumerated in this Complaint. Now, Mr. Hammond wants his money back, and he brings this legal action to get it.

**Parties**

4.    Plaintiff Kim Hammond is an individual residing in Baltimore, Maryland, and is a citizen of Maryland. Mr. Hammond is Chairman of Plaintiff Milnel Foundation, Inc. ("Milnel").

5.    Plaintiff Milnel is a charitable foundation that is incorporated in Maryland. Milnel is also a citizen of Maryland because its principal place of business is located at 8407 Greenspring Avenue, Baltimore, Maryland 21208.

6.    Defendant Ian S. Leopold is an individual residing in La Jolla, California, and is a citizen of California. At all times relevant to this Complaint, Leopold has been the President and Chief Executive Officer of Pridewear. Leopold has also been a managing or principal member of, and is authorized to act on behalf of and legally bind, Pridewear.

7.    Defendant Pridewear is a Delaware limited liability company with a principal place of business located at 575 Madison Avenue, New York, New York 10022. Formed in May 2012, Pridewear has three members: Leopold, a citizen of California; David Staub, a citizen of Illinois; and Christophe Karvelis, a citizen of France. *See* ECF No. 17-5 at 15.

8.    At all times relevant to this Complaint, Pridewear claimed to produce and sell various items of clothing including those purportedly used by intramural and club college athletes as well as fraternities and first responders.

2

## Jurisdiction

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the facts alleged in this Complaint demonstrate that the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and that this action is between citizens of different states.

10.     This Court may exercise personal jurisdiction over Defendants because they transacted substantial business in the State of New York and engaged in the tortious acts referenced in this Complaint in the State of New York.

11.     This Court may also exercise personal jurisdiction over Defendants because they expressly consented to have this Court do so by agreeing to a Common Unit and Warrant Purchase Agreement, in which the parties waived any claim that they are not subject to the personal jurisdiction of the courts of the State of New York. *See* ECF No. 17-4 at 9.

## Venue

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Hammond's claims occurred in this District.

13.     Venue is also proper in this District because the parties expressly consented to resolve this dispute in this forum by agreeing to a Common Unit and Warrant Purchase Agreement, which contains a forum selection clause, designating

this Court as the forum for the resolution of any claims or disputes "arising out of or based upon" that agreement. *See* ECF No. 17-4 at 9.[1]

### Allegations of Fact Common to All Counts

**A.    Leopold Approaches Mr. Hammond with an Investment Opportunity in Pridewear.**

14.    Mr. Hammond is a successful veterinarian who founded the Falls Road Animal Hospital in Baltimore, Maryland, which offers 24/7 care and is one of the first veterinary hospitals of its kind in the nation. Mr. Hammond has gained a national profile in the veterinary community, becoming a frequent guest speaker at animal welfare and veterinary advocacy events around the country. Mr. Hammond is also active in his community, creating several partnerships and events for first responder and similar health-focused organizations.

15.    Mr. Hammond first met Leopold in the early 1990s, when both were living in Baltimore, Maryland, at times as neighbors. Over many years, they developed a deep friendship.

16.    In or about October 2014, Leopold presented Mr. Hammond with an opportunity to invest in Pridewear, Leopold's business that he claimed sold apparel to college intramural and club athletes, fraternities, and first responders. Over the next several years, Leopold talked and corresponded with Mr. Hammond about Pridewear on several occasions, always portraying it as a promising business and

---

[1] Pointing to the same forum selection clause, Defendants sought to dismiss this matter for improper venue in the United States District Court for the District of Maryland or, alternatively, to transfer this matter to this Court. ECF No. 17. The Maryland District Court transferred this matter to this Court, acknowledging the same provision. ECF No. 23.

investment. Over time, Leopold's claims about Pridewear and his sales pitches to Mr. Hammond became more and more aggressive and—it is now clear—exaggerated.

17.    For example, when pitching Pridewear to Mr. Hammond, Leopold trumpeted Pridewear's supposed major partnerships with several nationally recognized brands, including Nike, Adidas, Amazon, and Under Armour. Leopold also touted Pridewear's purported partnerships with hundreds of university sports teams, fraternities, and first responder organizations.

18.    Leopold told Mr. Hammond that he would personally manage Mr. Hammond's investments in Pridewear, and that Mr. Hammond's money would be used to fund Pridewear's purchase of materials to produce clothes and apparel.

19.    Most lavishly, in a 2018 solicitation, Leopold claimed that Mr. Hammond's investment would fund a rapidly-growing business that would surpass $100 million in annual revenue within a few years and might even provide more wealth through a private equity buyout.

20.    But despite his outward optimism, Leopold's representations were false. Pridewear did not have the various partnerships Leopold described. It had only minimal or temporary relationships grossly mischaracterized as major partnerships. And Pridewear had nothing close to the infrastructure or staffing to support a $100 million business.

21.    Leopold also never expected Pridewear to generate the $100 million in revenue he represented to Mr. Hammond, and Leopold never intended to use Mr. Hammond's money for the benefit of Pridewear or for Mr. Hammond's investment.

### B. Mr. Hammond Makes His First Investments in Pridewear Through Purported Convertible Promissory Notes But Receives Nothing in Return.

22.     In early 2015, relying on his trusted, years-long friendship with Leopold, Leopold's purported investment expertise, and Leopold's enthusiastic representations about Pridewear, Mr. Hammond loaned $100,000 to Pridewear.

23.     The parties memorialized the transaction through a February 2, 2015 promissory note ("Promissory Note"). *See* ECF No. 17-3 at 1-5. Under the Promissory Note, Pridewear agreed to repay Mr. Hammond's $100,000 principal (now Pridewear's debt), along with 8% interest per year. *Id.*

24.     The Promissory Note also allowed Mr. Hammond to convert his $100,000 principal and any accrued interest into "membership interests." ECF No. 17-3 at 2. From May 2015 to April 2018, Mr. Hammond lent money to Pridewear four more times under the same material terms as those in the Promissory Note.

25.     According to Mr. Hammond's accounting records, the loans he made to Pridewear in the belief that they were to be convertible debt interests were as follows:

| 2/2/2015 (Initial Promissory Note) | $100,000 |
|---|---|
| 5/20/2015 | $25,000 |
| 8/22/2017 | $48,953 |
| 3/28/2018 | $59,474 |
| 4/27/2018 | $100,000 |
| **Total** | **$333,427** |

26.     In reasonable reliance on Leopold's representations, Mr. Hammond loaned Pridewear a total of $333,427, which again Defendants represented to be convertible debt interests issued to Mr. Hammond with an 8% interest rate.

27.     The Promissory Note stated that, if Mr. Hammond's loans were converted to equity, he was required to endorse the Promissory Note and surrender it at Pridewear's principal offices or at the offices of Pridewear's transfer agent. ECF No. 17-3 at 2.

28.     As of the date of this filing, Mr. Hammond has never endorsed the Promissory Note or surrendered it to Pridewear or to Pridewear's transfer agent. Nor has Mr. Hammond done so with respect to any of his subsequent loans to Pridewear, none of which was ever converted into an actual equity interest in the company.

29.     The Promissory Note also provided that, upon conversion of any of Mr. Hammond's debt to equity, Pridewear would "issue and deliver" to Mr. Hammond a certificate or other documentation showing the number of units to which Mr. Hammond was entitled upon conversion. *See* ECF No. 17-3 at 2-3.

30.     Pridewear, however, has never delivered any certificates or other documentation to Mr. Hammond that confirmed the number of units he supposedly held in Pridewear.

31.     In fact, throughout the years of his involvement with Leopold and Pridewear, Mr. Hammond frequently requested documentation on the status of his investments. As set forth below, however, it was not until April 2022—after repeated

requests for such documentation—that Mr. Hammond received any information from Pridewear about his purported investments.

32.    Defendants also refused to pay Mr. Hammond any of the 8% interest required to be paid under the promissory notes governing each of the loans referenced above.

33.    Leopold did not use—and never intended to use—Mr. Hammond's funds for Pridewear's benefit. Instead, Leopold funneled Mr. Hammond's investment to his own personal expenses, or to another, entirely separate entity he owned, American Collegiate Sports, LLC. *See* ECF No. 17-2 ¶¶ 7-8.

34.    As alleged below, for years Mr. Hammond frequently asked Leopold about the status of his investment, only to be met with silence.

**C.    Leopold Continues to Issue Lofty Projections about Pridewear's Performance and to Aggressively Solicit Further Investment.**

35.    On or about July 3, 2018, Leopold again asked Mr. Hammond to invest money in Pridewear.

36.    In a letter and accompanying solicitation deck sent to Mr. Hammond, Leopold stated that he was "[c]onfident [he had] a winner" in Pridewear, pointing to "several successful pilot programs" and purported partnerships with top brands such as Adidas and Under Armour, as well as "licenses" with over 100 universities and over 50 fraternities.[2] ECF No. 18-1 at 5, 7.

---

[2] Leopold's July 3, 2018 letter described Pridewear as "Pridegear," with the company being the "exclusive partner" of American Collegiate Sports & Fitness. *See* ECF No. 18-1 at 5. Yet the terms of which Leopold asked potential "Pridegear" investors to agree are the same as Mr. Hammond's previous investments in Pridewear—issuance of convertible debt interests that were to gain 8% interest. As stated below, Pridewear assumed several names during the relevant time period, including Pridegear.

37.    Most significantly, Leopold also emphasized to Mr. Hammond that Pridewear would "surpass" $100 million in revenue by 2022, a projection that Leopold deemed "conservative." ECF No. 18-1 at 5.

38.    Leopold also crowed that Pridewear's "benchmark competitor" was recently acquired "by Bain Capital for $2.5B," and that it was "[t]ime for us to play Major League Ball!"—suggesting to Mr. Hammond that Pridewear could be sold for a large windfall to a private equity firm. *Id*.

39.    In an attached solicitation deck, Leopold further touted Pridewear as a flourishing business, pointing to clients such as Procter & Gamble, Microsoft, Pepsi, Ford, and Colgate. ECF No. 18-1 at 8.

40.    Leopold's statements in the July 2018 letter and solicitation deck are representative of the many statements he employed over the years in his hard sell of Pridewear to Mr. Hammond. Yet at the time Leopold made these claims about Pridewear to Mr. Hammond in 2018, the company was not performing anywhere near Leopold's lofty projections but was instead—as set forth below—continually operating at a loss.

41.    Leopold never believed Pridewear would perform to the high-revenue expectations he represented to Mr. Hammond. Instead, Leopold planned to use more of Mr. Hammond's money to fund his own personal expenses and the expenses of his other business, ACS.

**D.    Mr. Hammond, Relying on Leopold's Representations, Continues to Invest in Pridewear.**

42.    Nevertheless, relying on Leopold's promotional statements in mid-2018, Mr. Hammond agreed to invest additional funds in Pridewear. To that end, Mr. Hammond and Pridewear entered into a Common Unit and Warrant Purchase Agreement ("CUWPA"), dated April 29, 2019. The CUWPA is governed by Delaware law. *See* ECF No. 17-4 at 8.

43.    The CUWPA allowed Mr. Hammond to receive "units" in Pridewear in exchange for his funding of the company. *See* ECF No. 17-4 at 1. The CUWPA also gave Mr. Hammond the option to purchase additional units in Pridewear through warrants that could be exercised in the future.

44.    After signing the CUWPA, Mr. Hammond made the investments listed below in Pridewear, separate and apart from his previous investments listed above (between February 2015 and April 2018):

| | |
|---|---|
| 4/30/2019 | $100,000 |
| 6/12/2019 | $100,000 |
| 6/18/2019 | $150,000 |
| 10/28/2019 | $50,000 |
| 12/6/2019 | $86,648 |
| 2/20/2020 | $75,000 |
| 3/27/2020 | $50,000 |
| 1/26/2021 | $95,000 |
| **Total** | **$706,648** |

45.    Not once after signing the CUWPA did Mr. Hammond receive any confirmation or documentation from Pridewear stating that he received any units (or any other investment stake) in Pridewear. This is not surprising, given that Mr. Hammond never received, nor ever signed, any operating agreement of Pridewear, nor agreed to be bound thereto.[3]

46.    Moreover, Mr. Hammond was never invited to, nor did he ever participate in, any meetings or votes regarding the management of Pridewear's business or the composition of its management personnel.

47.    Mr. Hammond also never executed the warrants to which he purportedly received under the CUWPA.

### E.    Mr. Hammond Invests Additional Money in Pridewear Through his Foundation, Milnel.

48.    As indicated above, Mr. Hammond is Chairman of Milnel, a private foundation that provides charitable grants for women's health, animal care, and other philanthropic causes. Mr. Hammond is also an advisory board member to the Johns Hopkins Program for International Education in Gynecology and Obstetrics ("JHPIEGO"), a charitable organization that operates globally in partnership with governments and health organizations to improve women's health.

---

[3] According to Leopold's Affidavit, Pridewear was originally named "American Collegiate Sports and Fitness, LLC" ("ACSF"), and changed its business name to Pridewear in 2015. ECF No. 17-2 ¶ 4. Leopold also affirmed that when ACSF was renamed to Pridewear, it did not replace ACSF's operating agreement. *Id.* ¶ 28. Thus, according to Leopold, the document filed on ECF No. 17-5, is a true and correct copy of Pridewear's operating agreement, even though ACSF is named in the document's title. ECF No. 17-2 ¶ 28; ECF No. 17-5.

49.     In or about Spring 2020, Leopold solicited Mr. Hammond to fund the production of branded athletic apparel for first responders. Mr. Hammond was happy to do so, and persuaded Leopold that the recipients should also include doctors, nurses, and other hospital/medical workers who were then working heroically through the COVID-19 pandemic.

50.     In line with that goal, on or about April 20, 2020, Milnel and Pridewear entered into a contract under which Milnel provided $71,000 to Pridewear for the production of athletic apparel that would be donated to first responders and medical workers. Leopold and Pridewear also agreed to provide athletic apparel to JHPIEGO through Milnel.

51.     Later in 2020, Mr. Hammond's accountants requested information from Leopold and Pridewear as to which organizations—whether first responders, medical personnel, or JHPIEGO—received the apparel and how much of it they received, for purposes of documenting Milnel's charitable donation.

52.     Neither Mr. Hammond nor Milnel ever received such information from Leopold or Pridewear, making it unclear how much, if any, of the purported $71,000 worth of apparel was ever produced or given to the intended recipients. Although Mr. Hammond received a few sample items, he confirmed that JHPIEGO never received the promised athletic apparel from Pridewear.

**F.      Pridewear Fails to Make Any Money.**

53.      Though Mr. Hammond thought he was investing in a legitimate high-revenue enterprise, Pridewear was far from that in reality. As indicated above, Pridewear failed to observe basic corporate formalities, including recordkeeping and issuance of investor documentation. Moreover, the company has not turned a profit since Mr. Hammond's investment. In fact, Pridewear operated at a loss every year from 2014 to 2022.

54.      In 2019—Pridewear's highest revenue year—the company generated only $229,894 in total revenue, a fraction of what Leopold had represented to Mr. Hammond it would be. In 2022—the year Leopold "conservatively" estimated that Pridewear would "surpass" $100 million in revenue—the company's actual revenue was only $17,594, and it operated at a $324,692 loss.

55.      In 2023, when Mr. Hammond finally received makeshift financial tables from Leopold regarding Pridewear's purported business, Mr. Hammond saw that Pridewear's payroll figures after 2018 could not have supported more than one or two employees—hardly the workforce to staff a $100 million business. Upon more recent research, Mr. Hammond found out that Pridewear was merely a shell company with no assets and that its Midtown Manhattan address appeared to be a shared-use business center where office space can be rented daily or weekly.

56.      In line with these findings, Mr. Hammond observed that Leopold kept changing the name of his company over time and—indicative of the fraudulent nature

of the enterprise—often used these business names (and accompanying email and website addresses) interchangeably.

57.    For example, Leopold founded the business in 2012 as "American Collegiate Sports and Fitness," but changed the name to "Pridewear" in 2015. ECF No. 17-2 ¶4. In his 2018 letter and solicitation deck to Mr. Hammond, Leopold called the company "Pridegear," using a Pridegear email address on the slide deck—but an email address for American Collegiate Sports and Fitness on the letter. ECF No. 18-1 at 5, 34.

58.    By at least in or about fall 2022, Leopold and his wife (and financial manager) Uria Espinoza were using signature blocks and email addresses for American Collegiate Sports & Fitness again, and by fall 2023 Leopold said his business had "re-branded" to American Collegiate Sports & Fitness—which supposedly was its name back in 2012. By December 2024, however, Leopold told Mr. Hammond that his company had "officially rebranded from Pridewear to AQONIQ," which he used in his signature block and email address. Ex. 1. But in a July 2023 email to Mr. Hammond, Leopold displayed website addresses for Pridewear.com, AQONIQ.com, and AthletesGear.com, among others.

### G.    Mr. Hammond Asks for Information on His Investment Along with the Return of His Investment Capital and Unpaid Interest.

59.    Throughout the term of his investment, Mr. Hammond frequently asked Leopold for documentation showing his interest in Pridewear. Yet for years neither Leopold nor anyone else at Pridewear informed Mr. Hammond about the status of his investment, even though Mr. Hammond raised multiple requests for information.

60.    Although Mr. Hammond was a Pridewear investor since 2015, it was not until April 2022—after repeated requests from Mr. Hammond and his accountants—that Defendants sent Mr. Hammond a K-1 tax statement purportedly showing his interests in Pridewear. The 2021 tax year was the first for which Mr. Hammond received a K-1 statement from Pridewear.

61.    As Pridewear continued to operate at a loss, Mr. Hammond never had his investment returned to him, nor did he ever receive the 8% interest he was owed for the $333,427 he lent to Pridewear between 2015 and 2018—which was never converted to equity.

62.    Despite knowingly taking Mr. Hammond's money, appropriating that money to his personal use, and consciously concealing Pridewear's poor performance for years, Leopold continued his unrestrained sales tactics, offering Mr. Hammond warrants for units of Pridewear.

63.    For example, in December 2024, Leopold contacted Mr. Hammond, telling him that Pridewear had rebranded as "AQONIQ," and exclaiming that the company had "finally 'cracked the code'" and was "'dialed in' for significant scaleable [sic] success." Ex. 1. Leopold said he waited to ask for Mr. Hammond's support until he "knew we had a winning hand," and that the opportunity Leopold was offering would "turbo-charge[] AQONIQ's success." *Id*.

64.    Leopold then asked Mr. Hammond to donate an additional 10%-20% of his total Pridewear investment to a first responder foundation that partnered with

the company, in exchange for AQONIQ / Pridewear warrants priced at $1.25 for every dollar donated. Leopold ended the solicitation, "The time to act is now!" *Id*.

65.    Leopold offered these warrants knowing that Pridewear was a poorly performing company and knowing that the warrants he offered would eventually be worthless.

66.    Starting in 2015, Mr. Hammond reasonably relied upon the representations, experience, and expertise of his then-friend Leopold. Yet today, after a decade and over one million dollars in financing, Mr. Hammond has nothing to show for his investment in Pridewear, and he has no valid information about the status of his investment or the interest he is owed.

## Causes of Action
### Count I – Fraud (against Leopold & Pridewear)

67.    Plaintiffs repeat and reallege paragraphs 1 through 66 as if fully set forth herein.

68.    Between approximately fall 2014 and January 2021, Leopold knowingly made false representations of material fact to Plaintiffs, both orally and in writing, to induce Plaintiffs to invest in Pridewear.

69.    Leopold falsely represented, among other things, that:

a) Pridewear had existing or imminent partnerships with major national brands, including Nike, Adidas, Under Armour, Amazon, Procter & Gamble, Microsoft, Pepsi, Ford, and Colgate;

b) Pridewear was a rapidly growing business projected to "surpass" $100 million in annual revenue, which Leopold described as a "conservative" estimate;

c) Pridewear worked with hundreds of universities, fraternities, and first responder organizations;

d) Plaintiffs' funds would be used to purchase inventory and support Pridewear's operations; and

e) Mr. Hammond would receive valid interests and warrants in Pridewear in exchange for his investments.

70.    Leopold made these representations during in-person meetings, including a lunch meeting in or about October 2014, and in written communications, including a letter and solicitation deck dated July 3, 2018, as well as in communications leading up to and following execution of the Promissory Note and the CUWPA.

71.    At the time Leopold made these representations to Mr. Hammond, they were false and misleading because: (a) Pridewear did not have the partnerships Leopold described or had only minimal or temporary relationships grossly mischaracterized as major partnerships; (b) Pridewear had nothing close to the infrastructure, facilities, or workforce required to generate $100 million in revenue; and (c) Leopold intended to divert, and in fact diverted, Plaintiffs' funds for his personal expenses and for the benefit of another entity he owned, American Collegiate Sports, LLC.

72.    Leopold never intended to use Plaintiffs' funds as represented to Plaintiffs, and he never intended to issue Mr. Hammond valid interests in Pridewear or to repay Plaintiffs' loans.

73.    Leopold knew his representations were false when made, or made them with reckless disregard for their truth, as he exercised exclusive control over

17

Pridewear's operations, finances, and bank accounts and had access to the company's financial records.

74.    Leopold made these misrepresentations with the specific intent to induce Plaintiffs to invest money in Pridewear and to have them continue investing additional funds in the company.

75.    Plaintiffs justifiably relied on Leopold's representations in deciding to invest and to continue investing in Pridewear because Leopold had a twenty-plus-year personal relationship with Mr. Hammond, held himself out as an experienced entrepreneur, and controlled all material information regarding Pridewear's financial condition.

76.    Leopold also knowingly omitted material facts necessary to make their affirmative representations not misleading, including that Pridewear operated at consistent losses; lacked meaningful revenue, infrastructure, or staffing; failed to observe corporate formalities; and functioned as an undercapitalized shell company. Leopold engaged in these tortious acts despite Mr. Hammond repeatedly asking about the status of his investment.

77.    These material misrepresentations and omissions occurred continuously between in or about fall 2014 and at least in or about December 2024, while Leopold solicited additional investments and reassured Plaintiffs that Pridewear was succeeding. Leopold's misrepresentations and omissions concerned present and historical facts, including Pridewear's existing financial condition, current partnerships, and intended use of investor funds.

78.    Because Leopold is the President and Chief Executive Officer of Pridewear, and because he engaged in the alleged tortious acts within the scope of his apparent authority to act on Pridewear's behalf, Plaintiffs seek to hold Pridewear liable through the doctrine of respondeat superior.

79.    As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs invested more than one million dollars in Pridewear and suffered substantial damages, including loss of principal, unpaid interest, and consequential damages.

**Count II – Breach of Contract – Promissory Notes (against Pridewear)**

80.    Plaintiffs repeat and reallege paragraphs 1 through 79 as if fully set forth herein.

81.    Mr. Hammond and Pridewear are parties to the Promissory Note, which is a valid and enforceable contract.

82.    Mr. Hammond and Pridewear are also parties to four additional promissory notes, all of which have the same material terms as the initial Promissory Note, including that Mr. Hammond is owed 8% interest per year on the money he lent to Pridewear under the promissory notes. The four additional promissory notes—like the initial Promissory Note—are valid and enforceable contracts.

83.    Mr. Hammond performed under all five promissory notes by lending the following funds to Pridewear:

| | |
|---|---|
| 2/2/2015 (Initial Promissory Note) | $100,000 |
| 5/20/2015 | $25,000 |
| 8/22/2017 | $48,953 |
| 3/28/2018 | $59,474 |
| 4/27/2018 | $100,000 |
| **Total** | **$333,427** |

84.    Mr. Hammond never endorsed any of his promissory notes or surrendered them to Pridewear or to Pridewear's transfer agent, and Pridewear never issued or delivered any certificates or other documentation to Mr. Hammond showing any units he purportedly held in Pridewear.

85.    Accordingly, Pridewear has materially breached the promissory notes by its continuous refusal to pay back the principal of Mr. Hammond's loans, along with the 8% interest required under the terms of those notes by the maturity date.

86.    As a direct and proximate result of Pridewear's material breach of the promissory notes, Mr. Hammond has suffered and continues to suffer substantial damages, including loss of principal, unpaid interest, and consequential damages.

**Count III – Breach of Contract – Common Unit and Warrant Purchase Agreement (against Pridewear)**

87.    Plaintiffs repeat and reallege paragraphs 1 through 86 as if fully set forth herein.

88.    Mr. Hammond and Pridewear are parties to the CUWPA, which is a valid and enforceable contract.

89.     Mr. Hammond performed under the CUWPA by making the following investments to Pridewear:

| 4/30/2019 | $100,000 |
|---|---|
| 6/12/2019 | $100,000 |
| 6/18/2019 | $150,000 |
| 10/28/2019 | $50,000 |
| 12/6/2019 | $86,648 |
| 2/20/2020 | $75,000 |
| 3/27/2020 | $50,000 |
| 1/26/2021 | $95,000 |
| **Total** | **$706,648** |

90.     Pridewear has materially breached the CUWPA by failing to furnish Mr. Hammond with any valid documentation of his interest in Pridewear or any accompanying units thereto.

91.     As a direct and proximate result of Pridewear's material breach of the CUWPA, Mr. Hammond has suffered and continues to suffer substantial damages, including loss of principal, unpaid interest, and consequential damages.

**Count IV – Breach of Contract – Milnel Transaction (against Pridewear)**

92.     Plaintiffs repeat and reallege paragraphs 1 through 91 as if fully set forth herein.

93.     Milnel and Pridewear entered into a contract for the shipment of athletic apparel that was to be later donated to first responders and medical workers.

94.    Milnel performed under the contract by sending $71,000 to Pridewear.

95.    Pridewear materially breached that contract by failing to provide the full shipment—if indeed any—of the athletic apparel to the intended recipients.

96.    As a direct and proximate result of Pridewear's material breach of the contract, Milnel has suffered and continues to suffer substantial damages, including loss of principal, unpaid interest, and consequential damages.

**Count V – Negligent Misrepresentation (against Leopold and Pridewear)**

97.    Plaintiffs repeat and reallege paragraphs 1 through 96 as if fully set forth herein.

98.    A special relationship existed between Mr. Hammond and Leopold based on Leopold's long-standing relationship with Mr. Hammond, his ongoing advisory role, his exclusive control of material information, and his direct management of Mr. Hammond's invested funds.

99.    Leopold, possessing superior knowledge concerning Pridewear's finances and operations, supplied Mr. Hammond with false information regarding Pridewear's revenue, partnerships, operations, financial condition, and suitability as an investment. Given Leopold's position in Pridewear, he knew or should have known that the information he supplied to Mr. Hammond was false.

100.    Leopold knew or should have known that the information he supplied to Mr. Hammond was necessary for Mr. Hammond and that he intended to rely upon it when deciding whether to provide funds to Pridewear. At a minimum, Leopold failed to exercise reasonable care in communicating this information.

22

101.    Given their special relationship and Leopold's purported investment expertise, Mr. Hammond reasonably relied upon the information given to him by Leopold to decide whether to invest and continue investing in Pridewear.

102.    Leopold told Mr. Hammond that he was an experienced investor, and Leopold had full control over Plaintiffs' funds when they loaned or invested money in Pridewear.

103.    Because Leopold is the President and Chief Executive Officer of Pridewear, and because he engaged in the alleged tortious acts within the scope of his apparent authority to act on Pridewear's behalf, Plaintiffs seek to hold Pridewear liable through the doctrine of respondeat superior.

104.    As a direct and proximate result of Defendants' negligent misrepresentation, Plaintiffs invested more than one million dollars in Pridewear and suffered substantial damages, including loss of principal, unpaid interest, and consequential damages.

### Count VI – Tortious Interference with Contractual Relations (against Leopold)

105.    Plaintiffs repeat and reallege paragraphs 1 through 104 as if fully set forth herein.

106.    Mr. Hammond entered into valid and enforceable contracts with Pridewear, including the February 2, 2015 Promissory Note and related notes.

107.    Leopold, although President, Chief Executive Officer, and managing member of Pridewear, was not a party to any of the above-referenced promissory notes in his individual capacity.

108.    Leopold had actual knowledge of the promissory notes and their material terms.

109.    While purporting to act on Pridewear's behalf, Leopold acted outside the scope of any legitimate corporate authority by diverting funds for personal use or for the use of his other company, ACS.

110.    Leopold's diversion of Mr. Hammond's funds was not undertaken to advance Pridewear's business interests, but instead, deprived Pridewear of the funds required to perform its contractual obligations to Mr. Hammond—either by paying the principal of Mr. Hammond's loans or the interest due on those loans.

111.    Leopold acted solely to advance his own personal financial interests, which were adverse to Pridewear's interests, including by preserving funds for himself while knowingly exposing Pridewear to contractual liability and insolvency.

112.    Leopold knew, or was substantially certain, that his misappropriation of Mr. Hammond's funds would render Pridewear unable to perform its obligations under the promissory notes.

113.    As a direct and proximate result of Leopold's wrongful conduct, Pridewear failed to repay Mr. Hammond's principal, the contractually required interest, and otherwise breached the promissory notes.

114.    Mr. Hammond suffered damages as a result of Leopold's tortious interference, including loss of principal, unpaid interest, and consequential damages.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor and against Defendants which includes the following prayers for relief:

a)  Compensatory Damages in the amount of $1,211,075, which includes $1,040,075 in total investments Mr. Hammond made to Pridewear; the $71,000 payment Milnel made to Pridewear; and $100,000 in interest owed to Mr. Hammond under the promissory notes referenced above;

b)  $500,000 in consequential damages stemming from foreseeable events occurring due to Defendants' conduct;

c)  Any other pre- and post-judgment interest and costs; and

d)  Any other relief as the Court deems just and proper.

Dated: January 21, 2026

/s/ *David M. Rody*
David M. Rody
ZUCKERMAN SPAEDER LLP
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
(410) 949-1177
drody@zuckerman.com

*Counsel for Plaintiffs Kim Hammond and Milnel Foundation, Inc.*

**Certificate of Service**

I certify that on January 21, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

/s/ *David M. Rody*
David M. Rody